UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

UNITED STATES OF AMERICA,
Plaintiff,

v.

DAVID SUBIL and JUAN MANUEL SANCHEZ ABREU,
Defendants.

CASE NO. 2:23-cr-00030-TL

ORDER ON MOTION TO SUPPRESS

This matter is before the Court on Defendant David Subil's Motion to Suppress (Dkt. No. 147) and Defendant Juan Manuel Sanchez Abreu's Motion to Join Co-Defendant Subil's Motion to Suppress (Dkt. No. 189). Mr. Sanchez Abreu adopts Mr. Subil's arguments to the extent relevant to him and offers analysis as to his own standing to invoke the Fourth Amendment arguments raised by Mr. Subil. Having considered the Motions, the Government's Response to the Motion to Suppress (Dkt. No. 155), Mr. Subil's Reply (Dkt. No. 158), and the Government's Response to the Motion to Join (Dkt. No. 200), and having heard oral argument

on the Motion to Suppress on September 29, 2026 (*see* Dkt. No. 179), the Court GRANTS Mr. Sanchez Abreu's Motion to Join and DENIES the Motion to Suppress as to both Defendants.

## I. Background

The Court assumes familiarity with the allegations and general facts in this case. *See generally* Dkt. No. 1 (Complaint as to Mr. Subil, No. MJ23-74); Dkt. No. 1 (Complaint as to Mr. Sanchez Abreu, No. MJ23-373); Dkt. No. 110 (Third Superseding Indictment); *see* Dkt. No. 147 at 1–6; Dkt. No. 155 at 2–6. Except where noted, the following facts are drawn from the Motion to Suppress.

On January 18, 2023, and January 20, 2023, two loads of frozen crab were picked up from North Star Cold Storage by a truck driver using a refrigeration truck bearing a Ryder Truck Rental logo. The Crab was owned by Arctic Seafood, and the pickups had been arranged by a person using the name Chris Delgado, who claimed to be a seafood buyer from Safeway/Albertson's grocery store chain. A few days later, the owner of Arctic Seafood called Safeway/Albertsons to try to reach Chris Delgado and was told Delgado did not work for the company. The owner contacted the Stanwood Police Department ("SPD"), which began an investigation into possible fraud and theft of the crab.

According to documents created by SPD, on January 23, 2023, an officer spoke with a Ryder Truck Rental employee and inquired as to which of their trucks had been near North Star Cold Storage on January 18 and 20. Dkt. No. 147-1 (SPD Report) at 2. The employee informed the officer that Ryder trucks are equipped with global positioning system ("GPS") devices, and that she would attempt to determine which of their trucks had been near North Star on January 18 and 20. Dkt. No. 147-2 (Affidavit for Search Warrant) at 6.

On January 25, 2023, law enforcement conducted a sting operation involving a third seafood pickup from North Star Cold Storage arranged by "Chris Delgado." The truck used in

that pickup (which was not a Ryder rental truck) was tailed from the scene, ultimately leading to the arrest of Mr. Sanchez Abreu. *See generally* Dkt. No. 149 (Motion to Suppress Evidence from Search of Truck).

On February 7, 2023, a Ryder employee informed Agent Spitzer of United States Homeland Security Investigations ("HSI") that the truck in question had been rented by an individual named David Subil. Dkt. No. 1 (Complaint, No. MJ23-74) ¶ 22. On February 8, 2026, the Department of Homeland Security sent Ryder an administrative subpoena requesting:

> Any and all documents in your custody and control related to the truck rental on or about January 17, 2023, to either Global Supply P & P Inc., or Juan Manuel Sanchez-Abreu, including but not limited to, the rental agreement, any documents photographed at the time of rental, methods of payment, e-mail addresses, telephone numbers, and any other documents or communications related to this rental.

Dkt. No. 147 at 6. On February 22, 2023, Ryder complied with the subpoena by producing the Ryder truck's rental agreement along with GPS data showing the truck had been present at North Star Cold Storage on January 18, 2023, and January 20, 2023, and had driven from North Star to a location in Portland, Oregon. Dkt. No. 155 at 6 (citing Dkt. No. 147-5 (HSI Report)).

The documents produced by Ryder showed that Mr. Subil rented a Ryder truck on January 17, 2023, which was returned on January 26, 2023. Dkt. No. 147-4 (Ryder rental agreement) at 2. The rental agreement between Mr. Subil and Ryder lists Global Supply Systems, Inc. as the renter, Mr. Subil as the contact person, and Mr. Sanchez Abreu as the driver. *Id.* at 4. The terms of the agreement include the following language:

> Each Vehicle may be equipped with certain on-board technology and/or a telematic device consisting of a transceiver box, antenna and other related equipment and hardware (collectively, the "Device") that may have the capability of sending information regarding such Vehicle's use and operation, including, but not limited to, diagnostic information and location information (collectively, the "Information") to Ryder without notice to

> Customer. Ryder's collection of such Information is for data and informational purposes only and is designed to assist Ryder and Customer to better manage and maintain each Vehicle. Customer shall have the sole responsibility to ensure that all drivers and occupants understand the possibility of the collection and dissemination of such Information. Customer agrees that Ryder may use the Information in furtherance of this Agreement, to locate or recover a Vehicle that is lost, stolen, in need of service, to evaluate the condition of the Vehicle or for any other lawful purpose. Ryder may aggregate the data with information from other vehicles to better Service your fleet. In doing so, Ryder may disclose the Information to third parties to assist in managing your fleet but shall remove any information identifying Customer. Ryder agrees to use the same degree of care in handling the Information that it uses to protect its own information. . . . The Device, all related software and all data collected from the Device shall at all times remain the property of Ryder.

*Id.* at 5.

For the purposes of this motion, the Parties appear to agree that Mr. Sanchez Abreu, working under contract for Global Supply Systems, Inc., was the driver of the truck at all relevant times, that Global Supply Systems, Inc. is Mr. Subil's company, and that Mr. Subil never drove the Ryder rental truck. *See* Dkt. No. 147 at 7, Dkt. No. 155 at 8–9.

## II. LEGAL STANDARD

Federal Rule of Criminal Procedure 12(b)(3)(C) requires that a request for "suppression of evidence" be raised "by pretrial motion if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits."

Under the exclusionary rule, evidence obtained in violation of a person's Fourth Amendment rights, including any "fruit of the poisonous tree," is excluded from a criminal trial. *United States v. Cervantes*, 703 F.3d 1135, 1138–39 (9th Cir. 2012); *see also Alderman v. United States*, 394 U.S. 165, 171 (1969) ("The exclusionary rule . . . excludes from a criminal trial any evidence seized from the defendant in violation of his Fourth Amendment rights. Fruits of such evidence are excluded as well.").

## III. Discussion

### A. Motion to Join

No Party has opposed Mr. Sanchez Abreu's Motion to Join Mr. Subil's Motion to Suppress. The motion was timely filed on October 5, 2026, the deadline for pretrial motions. *See* Dkt. No. 146. The Motion to Join is therefore granted, and the Court considers the Motion to Suppress as brought jointly by both Defendants.

### B. Motion to Suppress

Mr. Subil, joined by Mr. Sanchez Abreu, seeks suppression of "all evidence obtained from the warrantless seizure and search of Electronic Logging Device ('ELD') and historical GPS records and data obtained from the Ryder Truck Rental Company documenting location and other data for a truck rented by Mr. Subil" and driven by Mr. Sanchez Abreu. Dkt. No. 147 at 1. Defendants argue that they had a reasonable expectation of privacy in the ELD and GPS information (*id.* at 7), which "reveals deeply private information and implicates core Fourth Amendment protections" (*id.* at 10) and which, "in the absence of exigent circumstances, . . . requires a warrant" to obtain (*id.* at 14 (citing *Carpenter v. United States*, 585 U.S. 296, 316–17 (2018)). Ryder's warrantless search of its GPS data "at the request of the Government," Defendants argue, was therefore an unlawful search that violated their Fourth Amendment rights. *Id.* at 15. Defendants also submit that this case can be analyzed under a "property-based approach." Dkt. No. 147 at 17 (quoting *United States v. Jones,* 565 U.S. 400, 405 (2012)).

The Government argues that only Mr. Sanchez Abreu, not Mr. Subil, has standing to assert the Fourth Amendment challenges Mr. Subil purports to raise. *See* Dkt. No. 200 at 1, 3; Dkt. No. 155 at 7–9. Regardless of standing (*see infra* Section III.B.2), the Government argues that Ryder's disclosure of GPS data to law enforcement was not a Fourth Amendment search. Dkt. No. 155 at 9–10. The Government further argues that, even if a search occurred, Ryder

consented to the search (*id.* at 10–11), the Court should apply the good faith exception to decline to suppress the fruits of any unlawful search (*id.* at 11), and any suppression the Court does order should be narrowly cabined (*id.* at 11–12).

**1. Ryder's Disclosure of the ELD Data Was Not a Fourth Amendment Search**

The "third-party doctrine" provides that a third party's voluntary disclosure of information to law enforcement is not a search within the meaning of the Fourth Amendment, because "a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties." *Smith v. Maryland*, 442 U.S. 735, 743–45 (1979). "That remains true 'even if the information is revealed on the assumption that it will be used only for a limited purpose.'" *Carpenter*, 585 U.S. at 308 (quoting *United States v. Miller,* 425 U.S. 435, 443 (1976)). In *Smith*, for example, the Supreme Court found that when a person dials a telephone number, they "voluntarily convey[] numerical information to the telephone company and 'expose[]' that information to its equipment in the ordinary course of business," thereby "assum[ing] the risk that the company w[ill] reveal to police the numbers [they] dialed." 442 U.S. at 744. Similarly, in *Miller*, the Court found there is "no legitimate 'expectation of privacy' in . . . information voluntarily conveyed to . . . banks and exposed to their employees in the ordinary course of business," so no Fourth Amendment search occurs when a bank voluntarily (or pursuant to a subpoena or court order) provides a customer's financial information to law enforcement. 425 U.S. at 442.

In 2018, however, the Supreme Court's decision in *Carpenter* carved out an important exception to this rule. There, the Court considered the subject of "cell-cite location information" ("CSLI") collected by cell phone companies, and it declined to extend the holdings of *Miller* and *Smith* to include CSLI turned over by cellular carriers pursuant to a court order without a requirement of probable cause. 585 U.S. at 301, 309. The Court found that people have a

reasonable expectation of privacy in their CSLI, even though it is collected by wireless carriers in the course of business, and a warrant is required for law enforcement to obtain this data. *Id.* at 308.

Mr. Subil, joined by Mr. Sanchez Abreu, argues that the holding of *Carpenter* extends to the ELD information collected by Ryder regarding the rental truck, and that Defendants had a legitimate expectation of privacy in the location data chronicling the movements of the Ryder truck rented by Mr. Subil and driven by Mr. Sanchez Abreu. Dkt. No. 147 at 7–8. At oral argument, counsel for Mr. Subil clarified his position that *Carpenter*'s holding is not limited to CSLI but also applies to personal "location data" including the ELD data at issue here. The Government, pointing to what appears to be the only other district court case considering whether the third-party doctrine applies to rental-car GPS data, argues that rental-car location data is unlike CSLI because:

> rental cars are not 'intimately intertwined with the daily life of the user' like cell phones, . . . 'people renting cars generally understand rental car companies may use location data' for the benefit of the company, and . . . defendants have no property interest in rental car data because that data was voluntarily provided to the rental car compan[y].

Dkt. No. 155 at 10 (quoting *United States v. Brown*, 627 F. Supp. 3d 206, 223–24 (E.D.N.Y. 2022).[1]

The *Carpenter* opinion certainly offers compelling evidence that the justices who authored and joined it were concerned about "digital location data" writ large. For example, the Court framed the issue presented to it as being a novel one at the intersection of the third-party-doctrine line of cases (*Smith* and *Miller*) and a separate line of cases addressing "a person's expectation of privacy in his physical location and movements." 585 U.S. at 306. The cases in

[1] The Government also cites *United States v. Khalladi*, No. CR23-34, 2024 WL 4132307, at *5 (D. Vt. Sept. 10, 2024), as a case in the third-party doctrine was applied to "rental car GPS location information voluntarily provided by rental car companies to law enforcement." But *Khalladi* had nothing to do with GPS location information.

this second line, *United States v. Knotts*, 460 U.S. 276 (1983), and *Jones,* 565 U.S. 400, dealt with physical "beeper" or GPS trackers placed in or on the vehicles of suspects in criminal investigations. The *Carpenter* Court noted that, although the holding in *Jones* ultimately turned on "the Government's physical trespass of the vehicle" to place a GPS device, "five Justices agreed that related privacy concerns would be raised by, for example, 'surreptitiously activating a stolen vehicle detection system' in Jones's car to track Jones himself, or conducting GPS tracking of his cell phone." 585 U.S. at 307 (quoting *Jones*, 565 U.S. at 426 (Alito, J., concurring in judgment)).

The *Carpenter* majority clearly shared these concerns. Even so, as much as it may have indicated its sympathy to Defendants' position, the Supreme Court did not adopt a rule excluding all electronic location data from the third-party doctrine represented by *Miller* and *Smith*. Instead, the Court limited the scope of its holding in *Carpenter* to "the unique nature of cell phone location information," stating, "Our decision today is a narrow one. We do not express a view on matters not before us . . . ." *Id*. at 315–16. On a careful reading of the opinion in *Carpenter*, this Court finds numerous reasons that the ELD data at issue in this case was a "matter not before" the *Carpenter* Court, and thus falls outside its holding.

First, although the *Carpenter* majority relied on the *Jones* Court's discussion of the intimate details that could be revealed by GPS tracking of a car, it specifically found that "cell-site records present even greater privacy concerns than the GPS monitoring of a vehicle we considered in *Jones*":

> Unlike the bugged container in *Knotts* or the car in *Jones,* a cell phone—almost a feature of human anatomy, tracks nearly exactly the movements of its owner. While individuals regularly leave their vehicles, they compulsively carry cell phones with them all the time. A cell phone faithfully follows its owner beyond public thoroughfares and into private residences, doctor's offices, political headquarters, and other potentially revealing locales. . . .

> Accordingly, when the Government tracks the location of a cell phone it achieves near perfect surveillance, as if it had attached an ankle monitor to the phone's user.

585 U.S. at 311–12 (citation modified). This reflects a clear determination that, however sensitive a car's GPS location data may be, it is less sensitive than CSLI. Here, moreover, the location data in question is not about a car, but a rented refrigeration truck—a commercial vehicle that is less likely than a personal car to "reflect[] a wealth of detail about [a person's] familial, political, professional, religious, and sexual associations." *Jones*, 565 U.S. at 415 (Sotomayor, J., concurring) (citing *People v. Weaver,* 12 N.Y.3d 433, 441–442 (2009) ("Disclosed in [vehicle GPS] data . . . will be trips the indisputably private nature of which takes little imagination to conjure: trips to the psychiatrist, the plastic surgeon, the abortion clinic, the AIDS treatment center, the strip club, the criminal defense attorney, the by-the-hour motel, the union meeting, the mosque, synagogue or church, the gay bar and on and on.")). The Ryder truck's ELD data therefore does not raise the same privacy concerns as even the GPS data in *Jones*, much less the CSLI in *Carpenter*.

Second, the *Carpenter* Court held that cell phone location data "is not truly 'shared'" because carrying a cell phone at all times has become "indispensable to participation in modern society" and CSLI is collected automatically whenever a phone is used on the network. 585 U.S. at 315. "As a result, in no meaningful sense does the user voluntarily assume the risk of turning over a comprehensive dossier of his physical movements." *Id.* (citation modified). A rented commercial truck, by contrast, is not indispensable to modern life, and Mr. Subil *did* voluntarily assume the risk of sharing the truck's location data with Ryder when he agreed to the rental contract—both acknowledging Ryder's collection (and ownership) of the ELD information and committing to informing Mr. Sanchez Abreu of the location-sharing as well.

Third, the *Carpenter* Court insisted "this case is not about 'using a phone' or a person's movement at a particular time. It is about a detailed chronicle of a person's physical presence compiled every day, every moment, over several years." *Id*. at 315. By contrast, the ELD records here were accessed specifically to answer the question of who was *using a rented truck* at a particular time, in a particular place, in furtherance of an alleged crime. Only the truck's movements—not any person's—were chronicled around the clock, and only (in connection with Defendants) for ten days. The data collected does not create a complete record of any person's physical presence at "every moment" of any of those days, and certainly not "over several years."

Fourth**,** the *Carpenter* Court was concerned with preventing "seismic shifts in digital technology" from giving the government the previously unimaginable power to "travel back in time to retrace a person's whereabouts, subject only to the retention polices of the wireless carriers, which currently maintain records for up to five years." *Id*. at 312–13. Here, though, the Government did not seek access to a novel database with years of data on essentially every person's location at every moment of their lives. Instead, it contacted one specific rental company whose truck was observed in use as part of an alleged crime and asked who had been renting the truck when it was observed at the scene. Had anyone at Arctic Seafood written down the truck's license plate, or had it been recorded by a security camera, the truck in question (and thus the renter) might have been identified from that data point. Instead, location data was used. While ELD is undoubtedly a new technological tool, its use here did not give "access to a category of information otherwise unknowable" the way that CSLI does, nor does it represent a "newfound" and qualitatively different "tracking capacity" that "runs against everyone." *Id.*

On the whole, therefore, the Court does not find that either Mr. Subil or Mr. Sanchez Abreu had a legitimate expectation of privacy in the Ryder truck's ELD records that resembles

the expectation of privacy the *Carpenter* Court found in CSLI. The Court therefore finds that its decision is not governed by *Carpenter* but remains controlled by *Miller* and *Smith*. Like the financial records and call logs considered in those cases, the ELD records Ryder collected for each of its trucks are clearly "business records" that belong to the business that created them and of which Defendants can "assert neither ownership nor possession[.]" *Miller*, 425 U.S. at 440. (Relatedly, the Court rejects Mr. Subil's argument that he had a "property interest" in the ELD data, which is not supported by any of the authorities he cites. *See* Dkt. No. 147 at 17–18). By renting and driving the Ryder truck, respectively, Mr. Subil and Mr. Sanchez Abreu voluntarily disclosed its location data to Ryder, and they therefore had no legitimate expectation of privacy in that data. The Court therefore finds that no Fourth Amendment search occurred when Ryder consulted its ELD records to identify the truck present at the scene of the alleged crimes, nor when it provided law enforcement first with Mr. Subil's name as the renter of that truck, and then with the truck's full ELD log from the rental period.

Because no warrant was required for the information the Government obtained, suppression of any evidence flowing from Ryder's search and disclosure of ELD information is not warranted, and the Motion to Suppress will be denied.

**2. The Court Need Not Reach Defendants' Other Arguments**

Having found that neither Mr. Subil's nor Mr. Sanchez Abreu's Fourth Amendment rights were violated when Ryder voluntarily provided the ELD data to law enforcement, and that suppression of any evidence flowing from these disclosures is therefore not warranted, the Court need not reach the Parties' other disputes, such as whether Mr. Subil lacks standing to contest any search as a person who never drove or physically possessed the rental truck.[2]

[2] Both the Government and Mr. Subil dedicate a significant portion of their briefing to Mr. Subil's "standing" to challenge any search of the ELD data. *See* Dkt. No. 155 at 7–9; Dkt. No. 158 at 1–5. The Government does not

## IV. Conclusion

Accordingly, Mr. Sanchez Abreu's Motion to Join (Dkt. No. 189) is GRANTED, and the Motion to Suppress (Dkt. No. 147) is DENIED as to both Defendants.

Dated this 6th day of November, 2026.

Tana Lin
United States District Judge

---

contest Mr. Sanchez Abreu's standing. Dkt. No. 200 at 1.

While the question of a criminal defendant's ability to bring a Fourth Amendment challenge is commonly referred to "as one of Fourth Amendment 'standing,'" the concept, rooted in the question of a person's reasonable expectation of privacy, "is not distinct from the merits" of a Fourth Amendment claim and "should not be confused with Article III standing, which is jurisdictional and must be assessed before reaching the merits." *Byrd v. United States*, 584 U.S. 395, 410–11 (2018).