UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br><br>v.<br><br>DAVID SUBIL and JUAN MANUEL SANCHEZ ABREAU,<br>Defendants. | CASE NO. 2:23-cr-00030-TL<br><br>ORDER ON MOTION TO DISMISS INDICTMENT |

Defendant David Subil moves to dismiss the charges against him pursuant to Federal Rule of Criminal Procedure 12(b) because the Government failed to preserve critical evidence that he asserts is material to his defense. Dkt. No. 170 at 1. Having considered Defendant Subil's Motion to Dismiss Indictment, *id.*, Co-Defendant Juan Manuel Sanchez Abreu's notice of joinder in the motion[1] (Dkt. No. 188), the Government's opposition (Dkt. No. 182), Mr. Subil's reply (Dkt. No. 196), and the relevant record, and finding neither oral argument nor an evidentiary hearing necessary, *see* CrR 12(b)(12), the Court DENIES the motion.

[1] The notice of joinder was timely filed on October 5, 2026, the deadline for pretrial motions. Dkt. No. 146.

## I. Background

The Court assumes familiarity with the allegations and general facts in this case. *See generally* Dkt. No. 1 (Complaint as to Mr. Subil, No. MJ23-74); Dkt. No. 1 (Complaint as to Mr. Sanchez Abreu, No. MJ23-373); Dkt. No. 110 (Third Superseding Indictment); Dkt. No. 170; *see* Dkt. No. 12 at 2–9.[2]

Mr. Subil and Mr. Sanchez Abreu are charged with Conspiracy to Commit Interstate Transportation of Stolen Property, Transportation of Stolen Property, Conspiracy to Commit Money Laundering, and Money Laundering. Dkt. No. 110. The Government alleges that Mr. Subil and Mr. Sanchez Abreu conspired to fraudulently order hundreds of thousands of dollars' worth of Russian King Crab from Arctic Seafood while posing as "Safeway," obtained that seafood from a storage facility located in Washington that contracted with Arctic Seafood to store and ship its goods, and transported the seafood to Florida where it was resold for a profit. *Id.* ¶¶ 2, 11; Dkt. No. 1 ¶ 6. The Government alleges that there were four pick-ups from the storage facility. The first pick-up was of 600 cases of crab (Dkt. No. 1 ¶ 19); the second pick-up was of 640 cases of crab (*id.*); the third pick-up was supposed to be for another 12,000 pounds of crab, but the storage facility was instructed to put product of lesser value in the boxes (*id.* ¶ 24); and the fourth pick-up was of another 12,000 units of crab (*id.* ¶ 49), which was also replaced with lesser-value product (*see id.* ¶ 78), and into one box of which a court-authorized GPS tracking device was placed (*id.* ¶ 69).

Arctic Seafood discovered that the real Safeway grocery chain had not ordered any crab after the second pick-up. Dkt. No. 1 ¶ 12. A few days later, Arctic Seafood received an inquiry from Matt Garraway, one of its customers, inquiring after crab he had been offered at $5–8 per pound below market rate. Dkt. No. 182-3 (Stanwood Police Department Statement) at 2.

---

[2] Where cited in this Order, "Dkt. No. 1" refers to the Complaint as to Mr. Subil.

Mr. Garraway suspected the crab was from Arctic because it included red king crab in 4-7 count size, which is exceedingly rare, and Arctic was one of the only sellers of that product. *Id.* Mr. Garraway also suspected, due to the cut-rate pricing, that the proposed sale was not legitimate. *Id.* Mr. Garraway provided Arctic Seafood with: an email he had received from Jomara, the company offering the crab, showing the crab was from the same lot as that sold to "Safeway" as part of the first pick-up (Dkt. No. 170-2 (Gorelik—Martin emails) at 3); photographs of the crab inside boxes that matched the labels on the boxes (*id.* at 4); and additional photos of the crab, packaging, product labels, and shipping labels (*see generally* Dkt. No. 170-4 (Gallaway photos); Dkt. No. 182-4 (same)). When contacted by a special agent with United States Homeland Security Investigations ("HSI"), the Jomara representative stated he had purchased the crab from an individual named David at Global Supply P and P Inc. ("Global Supply"). Dkt. No. 1 ¶ 59. Global Supply is a Florida company of which Defendant Subil is the registered agent. *Id.* ¶ 62. No government official seized, viewed, or inspected the crab in Jomara's possession. Dkt. No. 170 at 4; Dkt. No. 170-9 (email from Government stating no frozen seafood was seized during the investigation); Dkt. No. 182 at 10 (Government citing Defendant's representation as support for its position that it never possessed, and therefore never destroyed, the crab in question).

The third pick-up, which consisted of product of lesser value intentionally placed into the boxes instead of Russian king crab, was followed from the Washington storage unit by law enforcement. Dkt. No. 1 ¶ 24. Law enforcement stopped the truck, searched it with the consent Mr. Sanchez Abreu and the other occupant of the truck, and saw that the closest two pallets in the trailer bore pallet "license plates" identical to photographs taken of the product prior to loading. *Id.* ¶¶ 34, 38, 39. The fourth pick-up was tracked from Washington to Oregon to Miami, Florida, and eventually to Fort Lauderdale, Florida. *Id.* ¶¶ 71–73. An HSI officer took a photo

from inside his vehicle of the boxes, with the tracker still pinging, in the location in Fort Lauderdale where the boxes had been dumped. *Id.* ¶ 74.

## II. Legal Standard

A district court may dismiss an indictment based upon the supervisory powers doctrine. *United States v. Isgro*, 974 F.2d 1091, 1094 (9th Cir. 1992), *as amended on denial of reh'g* (Nov. 25, 1992). The supervisory powers doctrine "is premised on the inherent ability of the federal courts to formulate procedural rules not specifically required by the Constitution or Congress to supervise the administration of justice." *Id.* (quoting *United States v. Larrazolo*, 869 F.2d 1354, 1358 (9th Cir. 1989). In order to invoke this power, a district court must first find that misconduct occurred and the defendant is actually prejudiced by the misconduct. *Id.* Absent "'grave doubt' that the decision to indict was free from the substantial influence of" the misconduct, dismissal is not warranted. *Bank of Nova Scotia v. United States*, 487 U.S. 250, 256 (1988).

## III. Discussion

Defendants move to dismiss the charges against them because the Government failed to preserve the allegedly stolen frozen crab, boxes, and labels from the first two pick-ups, which they assert are material to their defense. Dkt. No. 170 at 16; Dkt. No. 196 at 1. Defendants allege that Arctic also sold crab from the same lot as that it sold to "Safeway" to at least two other customers. Dkt. No. 170 at 6; Dkt. No. 170-10 (Arctic Seafoods Ledger); Dkt. No. 170-11 (Arctic Seafoods Invoices). They further assert that there is no way to know from the limited photographs provided by Arctic Seafood's customer "if the labels on all the boxes were the same, whether the lot numbers were the same, or the pack dates were the same." Dkt. No. 170 at 4–5. As a result, Defendants claim the photographic evidence that the Government has is "not sufficient to demonstrate that the product was the same crab that was picked up on January 18 or

20 that was allegedly stolen." Dkt. No. 170 at 6. Defendants have "no ability to determine whether the crab purchased by Jomara from Global depicted in the photographs taken by Garraway and Jomara is the same product that [they are alleged to have stolen] because frozen crab with the same pack dates and lot numbers were also sold to other buyers around the same time." Dkt. No. 196 at 2.

**A. Sufficiency of Government Evidence**

To the extent Defendants are challenging the Government's ability to prove they stole and transported the crab from Washington to Florida, a motion to dismiss is not the proper way to raise a factual defense. *United States v. Nukida*, 8 F.3d 665, 669 (9th Cir. 1993). Defendants' arguments amount to "a premature challenge to the sufficiency of the government's evidence tending to prove a material element of the offense." *Id.* at 669–70. At trial, Defendants will be able to vigorously cross-examine the Government's law-enforcement witnesses about the actions they took and did not take.

**B. Alleged Due Process Violation**

Defendants' assertion that the case should be dismissed because the Government's failure to seize the allegedly stolen crab violated their due process rights under the Fifth Amendment fares no better. *See* Dkt. No. 170 at 12. The government violates a defendant's right to due process "if the unavailable evidence possessed 'exculpatory value that was apparent before the evidence was destroyed, *and* [is] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.'" *United States v. Cooper*, 983 F.2d 928, 931 (9th Cir. 1993) (emphasis added) (alteration in original) (*quoting California v. Trombetta,* 467 U.S. 479, 489 (1984)). A defendant who satisfies these first two elements of the *Trombetta* test must then also demonstrate that the government acted in bad faith in failing to preserve the potentially useful evidence. *Id.* (citing *Arizona v. Youngblood,* 488 U.S. 51, 58

(1988)). The bad-faith requirement set out in *Youngblood* "dovetails with the first part of the *Trombetta* test: that the exculpatory value of the evidence be apparent before its destruction." *Id.* (citing *Trombetta,* 467 U.S. at 489).

Defendants claim that the facts of this case are similar to those in *Cooper* (*see* Dkt. No. 170 at 12), but they are not. The *Cooper* defendants were charged with conspiracy to manufacture methamphetamine and maintaining a place to manufacture methamphetamine. 983 F.2d at 930. They maintained that they ran a legitimate lab that made legal chemical products such as a fuel additive and naval jelly. *Id.* at 929. The DEA agent in the case seized and destroyed the lab equipment after (a) being told on several occasions (including by the parole officer of one of the defendants) of the claim that the lab was a legitimate lab that used the equipment to manufacture legal products, was specially configured for legitimate chemical processes, and was structurally incapable of methamphetamine manufacture; (b) discussing the claim that the lab was a legitimate one with his supervisor; and (c) informing a defendant's attorney that the equipment was being held as evidence. *Id.* at 930–31. Therefore, the government could not and did not dispute either that the equipment's potentially exculpatory value was apparent before its destruction or that the police acted in bad faith by allowing the equipment to be destroyed while assuring a defendant and his attorney that it was being held as evidence. *Id.* at 931. Finally, because the pictures taken during the seizure at issue in *Cooper* were inadequate to assess the capabilities of the equipment, there was no adequate substitute for the laboratory equipment that was destroyed. *Id.* 932. Under those facts, the Ninth Circuit held that the district court appropriately dismissed the indictment.

The rule represented by *Cooper* is a far cry from the facts of this case. First, although Defendants cite a number of cases and describe the facts in those cases, they do not explain how the exculpatory value of the evidence was apparent *in this case* so that the Government should

have seized it (as the Government never possessed and so did not destroy the evidence). *See* Dkt. No. 170 at 12–16. In their reply, Defendants suggest the evidence had exculpatory value because (1) the Government claims the labels showing the crab count to be "4-7" definitively identify the crab as the stolen product as that type of crab is characterized as exceedingly rare; and (2) the Government "overlooks the documented fact that Arctic sold the exact same produce including boxes with crab count '4-7' to other companies in addition to that picked up by the alleged Safeway buyer around the same time period." Dkt. No. 196 at 2. In support of their contention, Defendants cite Arctic invoices showing sales of the 4-7 crab count sold to another company. *Id.*; *see* Dkt. No. 170-11. But the evidence Defendants cite is the very reason they fail to meet the second prong of the *Cooper* test: whether the defendants have a "comparable, alternative means to support their assertion of innocence." *Cooper*, 983 F.2d at 929. In this case, even if the Government had seized and photographed every package of crab and the labels, Defendants would present the same invoices Mr. Subil attached to his motion to support their defense that those packages could have arrived via the other companies to which Arctic had sold crab from the same lots. Therefore, Defendants have comparable, alternative means to support their defense theory, and the Government did not violate their due process rights by failing to preserve the evidence related to the crab offered by Jomara.[3] As such, the Court need not reach the issue of whether the Government acted in bad faith.

//

//

//

---

[3] The Court finds the other cases cited by Defendants inapt as each involved a finding either that the evidence destroyed was the only evidence that could rebut certain government evidence, *see United States v. Chen*, No. CR18-450, 2019 WL 2503654, at *2 (N.D. Cal. June 17, 2019), or that law enforcement acted contrary to directives requiring the preservation of certain evidence, *United States v. Soriano*, 401 F. Supp. 3d 396 (E.D.N.Y. 2019).

**C. Alleged Brady Violation**

Defendants' assertion that the Government had a duty under *Brady v. Maryland*, 373 U.S. 83 (1963), to preserve the stolen crab and related evidence fails for the same reason their claim for a violation of their due process rights fails.

## IV. CONCLUSION

Accordingly, for the reasons stated in this Order, the Court DENIES Defendants' motions to dismiss (Dkt. Nos. 170 and 188).

Dated this 6th day of November, 2026.

Tana Lin
United States District Judge